FILED

2022 Sep-27  AM 09:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| VALERIE RUTH WHITE, )<br>)<br>    Plaintiff, )<br>)<br>    v. )<br>)<br>SOCIAL SECURITY )<br>ADMINISTRATION, )<br>COMMISSIONER, )<br>)<br>    Defendant. ) | Case No. 4:21-cv-00103-NAD |

## MEMORANDUM OPINION AND ORDER
## <u>AFFIRMING THE DECISION OF THE COMMISSIONER</u>

Pursuant to 42 U.S.C. § 405(g), Plaintiff Valerie Ruth White appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on her claims for disability benefits.  Doc. 1.  Plaintiff White applied for disability insurance benefits under Title II of the Social Security Act and supplemental security income (SSI) benefits under Title XVI of the Social Security Act.  Doc. 14-6 at 4–13.  In her applications, White alleged that she became disabled on July 30, 2018.  Doc. 14-6 at 4, 8.  The Commissioner denied White's claims for benefits.  Doc. 14-3 at 2–4, 30.

Pursuant to 28 U.S.C. § 636(c)(1) and Federal Rule of Civil Procedure 73, the parties consented to magistrate judge jurisdiction.  Doc. 12.  After careful consideration of the parties' submissions, the relevant law, and the record as a whole,

the court **AFFIRMS** the Commissioner's decision.

## ISSUES FOR REVIEW

In this appeal, Plaintiff White argues that the court should reverse for three reasons: (1) the Administrative Law Judge (ALJ) failed to give proper weight to the opinions of examining psychologist, Dr. June Nichols, Doc. 18 at 2; Doc. 20 at 5; (2) the testimony of the vocational expert ("VE") was not supported by substantial evidence, Doc. 18 at 2, 24; Doc. 20 at 9; and (3) the ALJ failed to adequately consider White's testimony regarding the side effects of her medications, Doc. 18 at 2; Doc. 20 at 11.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C.

2

§ 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled.  The ALJ must determine the following:

(1)　whether the claimant is engaged in substantial gainful activity;

(2)　if not, whether the claimant has a severe impairment or combination of impairments;

(3)　if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)　if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)　if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211.  At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national

economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or

substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.    Procedural background

On December 13, 2018, Plaintiff White applied for disability insurance benefits under Title II of the Social Security Act and SSI benefits under Title XVI of the Social Security Act. Doc. 14-6 at 4–13. In her applications, White alleged that she became disabled on July 30, 2018. Doc. 14-6 at 4, 8.

On February 6, 2019, the SSA initially denied White's disability claim (Doc. 14-4 at 35; Doc. 14-5 at 2–6), and her SSI claim (Doc. 14-4 at 36; Doc. 14-5 at 2–6).

The SSA granted White's request for a hearing (Doc. 14-5 at 13–14, 21–23); and, on January 8, 2020, a hearing was held by video teleconference before an ALJ (Doc. 14-3 at 53–77; Doc. 14-5 at 41–55, 71).  A vocational expert or "VE"—Dr. Mary Kessler—also appeared and testified at the hearing.  Doc. 14-3 at 53, 72–76.  On February 6, 2020, the ALJ sent post-hearing interrogatories to VE Kessler.  Doc. 14-7 at 119–20.

On April 9, 2020, the ALJ issued an unfavorable decision, finding that White was not disabled under the Social Security Act from July 30, 2018, through the date of the decision.  Doc. 14-3 at 30–45.

On February 2, 2021, White appealed that decision through counsel.  Doc. 14-5 at 77–79.  In support of her appeal, White submitted a brief to the SSA Appeals Council, arguing that the ALJ failed to accord proper weight to the opinions of Dr. June Nichols, and that the ALJ's decision was not based on substantial evidence.  Doc. 14-7 at 127–34.  On November 12, 2020, the Appeals Council denied White's request for review, finding that there was "no reason under [its] rules to review the Administrative Law Judge's decision."  Doc. 14-3 at 2.

After the Appeals Council denied White's request for review (Doc. 14-3 at 2–

4), the ALJ's decision became final for purposes of judicial review.  *See* 42 U.S.C. § 405(g).

### B.    Factual background

White was born on October 17, 1992.  Doc. 14-3 at 57; Doc. 14-6 at 4.  White lives with her parents, her sister, and her sister's husband.  Doc. 14-3 at 58.

In her initial applications for benefits, White claimed that she became disabled on July 30, 2018 (Doc. 14-6 at 4, 8; Doc. 14-7 at 2).  In support of her applications, White submitted an undated disability report, stating that she was unable to work because of valgus deformity in her knees, ADHD, arthritis, PCOS, depression, and anxiety.  Doc. 14-7 at 23.  In that report, White stated that she last worked on July 30, 2018 (i.e., her alleged disability onset date), and that she had to quit working because of her medical conditions.  Doc. 14-7 at 23.  White stated that she had completed twelfth grade in 2011.  Doc. 14-7 at 23.

In a work history report dated December 20, 2018, White stated that she worked a variety of jobs from 2013 to 2018, including as a mold operator, a caregiver, a resident aide, a home health aide, a healthcare technician, a photographer, and a security officer.  Doc. 14-7 at 7.  White noted that "most of [her] work has been in the healthcare field," but that her "knees got to the point that she couldn't do it any longer" and she had to quit.  Doc. 14-7 at 14.  She also stated that she started having more panic and anxiety attacks at work, and that she would "have

no choice but to take [her] medication." Doc. 14-7 at 14.

White also submitted an undated adult function report.[1] Doc. 14-7 at 40–47. White reported that on a daily basis she "stay[s] in bed more than anything," but that she gets up in the morning, takes her medications, and eats food that she keeps in her room. Doc. 14-7 at 40. She reported that she will take a shower when she has enough energy, but that she has to lie back down in bed afterwards because standing in the shower hurts her knee and back. Doc. 14-7 at 40.

She reported that some months she does not take her medications because she has not "been able to afford them." Doc. 14-7 at 40.

White reported that she tries "to get outside whenever possible," and that she will "go outside to feed and water the cats" when she is able to do so. Doc. 14-7 at 41. She reported that she has trouble sleeping because of her knee and because her anxiety "keeps [her] up all night." Doc. 14-7 at 41. White has reminders on her phone and on sticky notes so that she remembers to take her medications. Doc. 14-7 at 42. She reported that she can make meals 3-4 times per week, but that her knee "gets so bad [she] ha[s] to ask for help," and that it hurts to "even sit and try to cook and wait for food to get done." Doc. 14-7 at 42.

White also reported that, while she keeps her room tidy, she throws her clothes

---

[1] The adult function report is dated October 17, 1992 (Doc. 14-7 at 47), but it appears that White wrote her date of birth, rather than the date that she completed the function report.

down the stairs for her family to launder, and that her family then brings the dry clothes back upstairs for her to fold. Doc. 14-7 at 42. White reported that she can drive and ride in a car, and that she is able to go out alone, but that if she drives for more than 15 minutes she has to "pull over and walk/stretch [her] knee out [be]cause it gets locked up." Doc. 14-7 at 43. White also reported that she can go shopping for groceries and can handle money. Doc. 14-7 at 43.

White reported that she likes to paint, swim, and watch television, and that she enjoys photography. Doc. 14-7 at 44. She reported that she used to enjoy "hiking, going to the gym, concerts, festivals, bowling, dancing, and more," but that she cannot do any of these activities now because of her "knee, foot, and lower back." Doc. 14-7 at 44. White also stated that she has "always been a social butterfly," but that she now cannot do the activities she used to enjoy. Doc. 14-7 at 45.

White reported that her conditions have affected the following abilities: lifting, squatting, bending, standing, walking, sitting, kneeling, and stair climbing. Doc. 14-7 at 45. She reported that she can walk for 15 minutes before she needs to rest, and that the length of time for which she can pay attention depends on how interested she is in the topic. Doc. 14-7 at 45. She reported that she follows written instructions "pretty well," but that she does better with written or hands-on instructions than with spoken instructions. Doc. 14-7 at 45. White reported that she

"get[s] along with everyone, of all ages, and all authorities," and that while she does not usually like change she "get[s] use[d] to it."  Doc. 14-7 at 46.  White stated that she "want[s] to be healthy and out of pain and able to get out of the house, go to work, meet people, [and] make and keep friends."  Doc. 14-7 at 47.  She also stated that she "need[ed] disability for a little while to help [her] get there."  Doc. 14-7 at 47.

White's friend—Mary Gurley—submitted a third-party adult function report regarding White's limitations.  Doc. 14-7 at 32–39.  Gurley reported that she has known White for one year, and that the amount of time they spend together varies, but that they "just hang out when life allows."  Doc. 14-7 at 32.  Gurley reported that White's daily activities "depend on how bad her knee is and how mobile she can be."  Doc. 14-7 at 32.  Gurley's other observations were consistent with the function report that White completed, including that White has difficulty falling asleep because of her anxiety (Doc. 14-7 at 33), that White struggles with standing while cooking or completing chores (Doc. 14-7 at 34), that White is able to drive and go shopping (Doc. 14-7 at 35), and that White enjoys watching television, swimming, organizing, and photography (Doc. 14-7 at 36).

### C.    The ALJ hearing

At the January 2020 ALJ hearing, counsel for White requested that the ALJ leave the record open for 10 days to allow additional time to submit an evaluation

from Dr. June Nichols.  Doc. 14-3 at 55–56.  The ALJ approved that request.  Doc. 14-3 at 56.

At the hearing, White testified that she had completed high school but had not received any additional education or vocational training.  Doc. 14-3 at 58.  She testified that she has not worked since July 2018.  Doc. 14-3 at 58.  White testified that she was fired from her last job as a security officer because of her panic and anxiety attacks, which caused her to miss work or made her unable to work when she would show up to the job.  Doc. 14-3 at 59.  She testified that she would miss shifts or have to leave work early "probably at least [8]" days in a 30-day period. Doc. 14-3 at 59.

White testified that before she worked as a security officer she worked in healthcare, where she was "basically like a CNA," and that her job involved lifting people, and her knee "was constantly giving out on [her]."  Doc. 14-3 at 60.

White also testified that her knee is "angled out," and that "it's like [her] kneecap is just shifted and [she] ha[s] no cartilage left."  Doc. 14-3 at 60.  She testified that she is in "constant pain," that falling is a problem, and that she "get[s] restless leg from it really bad."  Doc. 14-3 at 60.  White testified that, while her knee does not swell, it is a problem for her to stand, and that she can stand for "about 10, 15 minutes before [she] ha[s] to sit down."  Doc. 14-3 at 61.  She testified that, before standing back up, she needs to "sit for maybe 20, 30, 40 minutes" to "take the

pressure off for a little bit."  Doc. 14-3 at 61.

White testified that she has problems sitting in a chair for more than 20 or 30 minutes because of her degenerative disc disease, and that her knees get restless and she needs to stand up to stretch them.  Doc. 14-3 at 62.  She testified that, to stretch her knees, she usually stands for a minute, can walk, or will massage her knees to get her blood flowing.  Doc. 14-3 at 62–63.

White testified further that she is not taking medication for her knee pain, and that "nothing's ever really worked."  Doc. 14-3 at 62.  She testified that she takes medications related to her mental health, including Adderall, Klonopin, and Celexa, and that she believes her doctor is going to prescribe a new medication to help with anxiety.  Doc. 14-3 at 62.  She testified that all of the medications give her "a groggy or a fatigued type feeling," and that she is "constantly tired."  Doc. 14-3 at 63.  But White testified that she does not have to sleep during the day, and that even if she goes to bed "before like 12:00, at night, it takes so long for [her] to get to sleep."  Doc. 14-3 at 63.

White testified that she has gastrointestinal issues, and that every time she eats she has to deal with an upset stomach.  Doc. 14-3 at 64.  She testified that she often spends the first two hours of her day in the bathroom and is often nauseated.  Doc. 14-3 at 64.  She testified that she has trouble getting dressed and getting bathed for the day about 20 days out of a 30-day period.  Doc. 14-3 at 65.  She also testified

that she has gained 50 to 60 pounds since she stopped working, and that her weight gain has exacerbated problems with her knee.  Doc. 14-3 at 65.

White also testified that she has been diagnosed with polycystic ovaries, and that the primary effect is irregular periods.  Doc. 14-3 at 66.  White testified that her PCOS can cause her to lose a lot of blood, and that because she is already anemic this makes it so she "cannot get out of bed."  Doc. 14-3 at 66.  She testified that in the last 8 to 9 months this has happened 3 times, and that when this situation occurs she cannot get out of bed for 9 to 15 days.  Doc. 14-3 at 66–67.

White testified that she cannot maintain attention for the entirety of a 2-hour movie, and that she has panic attacks 3 to 4 days per week.  Doc. 14-3 at 67.  She also testified that interacting with strangers makes her anxious.  Doc. 14-3 at 68.

White also testified that she is able to do her laundry, but that her mother washes the clothes downstairs and brings them upstairs for White to fold.  Doc. 14-3 at 68–69.  She testified that she can fix herself food, but that she cannot "stand in the kitchen long, so it's almost always something microwaveable."  Doc. 14-3 at 69.  White testified that she is able to dress herself, but that she mostly just stays home during the day and spends time sewing.  Doc. 14-3 at 69–70.

As noted above, a vocational expert (or "VE"), Dr. Mary Kessler, also testified at the ALJ hearing.  Doc. 14-3 at 72–76.

VE Kessler described White's past work as a security officer as a semiskilled

job, performed at a light exertional level.  Doc. 14-3 at 73.  She described White's past work as a healthcare aide as a skilled job, with a medium exertional level, but performed at a heavy exertional level.  Doc. 14-3 at 73.  Kessler also described White's other job as a nursing aide as a semiskilled job, with a medium exertional level, but performed at a heavy exertional level.  Doc. 14-3 at 73.

Kessler testified that a hypothetical individual of White's same age, education, and work experience, who is limited to sedentary work with physical and mental limitations, would not be able to perform White's past jobs.  Doc. 14-3 at 74.  However, Kessler testified that a hypothetical individual with those same limitations[2] would be able to perform the jobs of a general office clerk, receptionist and information clerk, and other clerks, all of which are available in significant numbers in the national economy.  Doc. 14-3 at 74–75.

But Kessler testified that most employers "will not tolerate more than one to one and a half days [of absences] a month," and that most employers will not tolerate "more than five percent of the workday" spent off task.  Doc. 14-3 at 75.

---

[2] The ALJ asked VE Kessler to assume that the hypothetical individual could perform sedentary work but "[c]ould occasional[ly] climb ramps and stairs.  Never climb ladders, ropes or scaffolds.  Could frequently balance and stoop, could occasionally kneel and crouch and never crawl.  Should have no exposure to unprotected heights, hazardous machinery or commercial driving.  Would be limited to carrying out simple instructions.  Say understand, remember and carry out simple instructions.  And could occasionally push and or pull as well as operate foot controls with the right lower extremity."  Doc. 14-3 at 74.

### D.      Post-hearing development of the record

As noted above, at the hearing the ALJ permitted White another 10 days to submit additional evidence.   Doc. 14-3 at 55–56.   White then submitted a psychological evaluation from Dr. June Nichols, dated December 23, 2019, and a mental health source statement from Dr. Nichols, dated January 8, 2020.  Doc. 14-10 at 122–26.

As part of her psychological evaluation, Dr. Nichols reviewed White's past medical records.  Doc. 14-10 at 122.  Dr. Nichols noted that White "reported that her medications have been beneficial."  Doc. 14-10 at 123.  Dr. Nichols also noted that White's affect "ranged from tearful to within normal limits," that her "thought processes were within normal limits," and that her "[j]udgment and insight were considered to be good."  Doc. 14-10 at 124.  In her summary, Dr. Nichols noted that White's anxiety was "manageable with medication," but that she was "unable to sustain concentration and persist in work-related activity at a reasonable pace," and "unable to deal with normal pressures in a competitive work setting."  Doc. 14-10 at 125.

In her mental health source statement, Dr. Nichols indicated that White could not "maintain attention, concentration and/or pace for periods of at least two hours," could not "perform activities within a schedule and be punctual within customary tolerances," could not "sustain ordinary routine without special supervision," could

not "adjust to routine and infrequent work changes," and could not "interact with supervisors and/or co-workers."  Doc. 14-10 at 126.  Dr. Nichols also opined that, due to psychological symptoms, White would be off task 30% of an 8-hour day and would fail to report to work 10 days out of a 30-day period.  Doc. 14-10 at 126.  Dr. Nichols did not list any side effects of White's medications.  Doc. 14-10 at 126.

On February 6, 2020, the ALJ sent post-hearing interrogatories to VE Kessler.  Doc. 14-7 at 119–20.  The interrogatories explained that "[a]dditional medical evidence was submitted after the hearing and is now a part of the record.  Supplemental testimony from you is now necessary."  Doc. 14-7 at 119.  The interrogatories asked additional hypothetical questions about an individual who could perform work at a sedentary exertional level with multiple limitations,[3] and whether that individual could perform White's past work or other work in the national economy.  Doc. 14-7 at 119–20.

On February 14, 2020, VE Kessler responded to the interrogatories.  Doc. 14-7 at 122–23.  Kessler stated that the hypothetical individual described by the ALJ

---

[3] The limitations included the following:  "She could occasionally push and/or pull as well as operate foot controls with the right lower extremity; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occ[asionally] balance, stoop, and crouch; never kneel and crawl; and have no exposure to unprotected heights, hazardous machinery, or commercial driving.  She would be limited to understanding, remembering, and carrying out simple instructions; could have no more than occasional contact with the general public; and would need changes in the work environment to be gradually and infrequently introduced."  Doc. 14-7 at 119.

could not perform White's past work, but that the hypothetical individual could find jobs in the national economy, including as a production and table worker, an assembler and packager, and a clerk.  Doc. 14-7 at 122–23.

### E.    The ALJ's decision

On April 9, 2020, the ALJ issued an unfavorable decision on White's claims. Doc. 14-3 at 30–46.  The ALJ found that White was insured through December 31, 2021, and must establish disability on or before that date to be entitled to disability insurance benefits.  Doc. 14-3 at 34.

At step one of the sequential analysis, the ALJ found that White had not engaged in substantial gainful activity since July 30, 2018, her alleged disability onset date.  Doc. 14-3 at 36.

At step two, the ALJ found that White had severe impairments of obesity, right knee osteoarthritis, degenerative disc disease, major depressive disorder, and generalized anxiety disorder.  Doc. 14-3 at 36.  The ALJ considered SSR (Social Security Ruling) 19-2p in determining that White's obesity was a severe impairment that affects "the degree of functional restriction she experiences."  Doc. 14-3 at 36. The ALJ found that these impairments "have persisted, or are expected to persist, for a continuous period of twelve months or more," and "have caused more than a minimal effect on [White's] ability to perform basic work activities."  Doc. 14-3 at 36.

The ALJ also found that, while White had a history of seizures and gallbladder issues, there was "no evidence in the record to indicate that [White] ever suffered any work-related limitations as a result of these impairments." Doc. 14-3 at 36. Consequently, the ALJ found that those impairments were non-severe. Doc. 14-3 at 37.

At step three, the ALJ found that White did not have an impairment or combination of impairments that met the severity of the impairments in the SSA's "Listing of Impairments." Doc. 14-3 at 37. Specifically, the ALJ found that White's "right knee osteoarthritis does not meet listing 1.02," that White's "musculoskeletal impairment of degenerative disc disease does not meet listing 1.04," and that White's "limitations due to obesity are reflected in the below residual functional capacity [RFC]." Doc. 14-3 at 37. With respect to White's mental impairments, the ALJ found that the "severity of [her] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06." Doc. 14-3 at 38.

At step four, the ALJ found that White was unable to perform any of her past relevant work. Doc. 14-3 at 43–44. In making that finding, the ALJ assessed White's RFC and found, "[a]fter careful consideration of the entire record," that White "has the residual functional capacity to perform sedentary work," except that she "could occasionally push and/or pull as well as operate foot controls with the

right lower extremity; occasionally climb ramps and stairs"; but should "never climb ladders, ropes, or scaffolds; occasionally balance, stoop, and crouch; never kneel and crawl; and have no exposure to unprotected heights, hazardous machinery, or commercial driving."   Doc. 14-3 at 39.   The ALJ's RFC determination also accounted for White's mental impairments by finding that she "would be limited to understanding, remembering, and carrying out simple instructions; could have no more than occasional contact with the general public; and would need changes in the work environment to be gradually and infrequently introduced."  Doc. 14-3 at 40–41.

The ALJ found that, at the hearing, White had testified that she only takes medication for her mental impairments and not her physical impairments.  Doc. 14-3 at 41.

With respect to Dr. Nichols, the ALJ "[found] Dr. Nichols' opinion that [White] could do simple work persuasive."  Doc. 14-3 at 42.  But the ALJ found that "Dr. Nichols' opinions that [White] could not interact with others, concentrate, or handle work pressures are not persuasive."  Doc. 14-3 at 42.

At step five, after considering White's age, education, work experience, and RFC, the ALJ found that there were jobs in significant numbers in the national economy that White could perform.  Doc. 14-3 at 44–45.

Consequently, the ALJ determined that White was not disabled under the

Social Security Act.  Doc. 14-3 at 45.  Because the Appeals Council found no reason to review the ALJ's opinion, the ALJ's decision became the final decision of the Commissioner.

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards.

**I.    The ALJ properly assessed the opinions of Dr. June Nichols according to the applicable regulations, and substantial evidence supported the ALJ's decision to find some of Dr. Nichols' opinions not persuasive.**

The ALJ properly assessed the opinions of Dr. June Nichols pursuant to the applicable regulations, and substantial evidence supported the ALJ's decision to find some of those opinions not persuasive.  In her briefing, Plaintiff White argues that the ALJ failed to give proper weight to Dr. Nichols' opinions, and that the ALJ "summarily rejected" those opinions "without sufficient legal explanation."  Doc. 18 at 19; Doc. 20 at 5.

As an initial matter, the ALJ did not "summarily reject" the opinions of Dr. Nichols.  *See* Doc. 19 at 6.  Indeed, the ALJ found one of Dr. Nichols' opinions to be "*persuasive*."  Doc. 14-3 at 42 (emphasis added).  The ALJ "[found] Dr. Nichols' opinion that [White] could do simple work persuasive."  Doc. 14-3 at 42.  So, the ALJ did not summarily reject Dr. Nichols' opinions, and White does not challenge

in this appeal the ALJ's finding that one of Dr. Nichols' opinions was persuasive.[4]

However, the ALJ did find that Dr. Nichols' other opinions were "not persuasive."  Doc. 14-3 at 42.  The ALJ found that "Dr. Nichols' opinions that [White] could not interact with others, concentrate, or handle work pressures are not persuasive."  Doc. 14-3 at 42.  That finding tracked the applicable regulations and was supported by substantial evidence.

The SSA has revised its regulations on the consideration of medical opinions for all claims filed on or after March 27, 2017—like the claims in this case.  Under those revised regulations, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including the opinion of a treating or examining physician.   20 C.F.R. §§ 404.1520c(a), 416.920c(a).  And the Eleventh Circuit recently held that the SSA's new regulations validly abrogated the so-called "treating physician rule," such that an ALJ no longer is required to defer to the medical opinion of a treating physician.  *See Harner v. Social Sec. Admin, Comm'r*, 38 F.4th 892 (11th Cir. 2022).

---

[4] Other than arguing that the ALJ should not have summarily rejected Dr. Nichols' opinions, White has not suggested that the ALJ erred in assessing Dr. Nichols' opinions; so any additional issue regarding the ALJ's evaluation of Dr. Nichols' opinions has been abandoned.  *See, e.g.*, *Singh v. United States Atty. Gen.*, 561 F.3d 1275, 1278–79 (11th Cir. 2009) ("[S]imply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes [this court from] considering the issue on appeal."); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (similar).

Instead, the ALJ considers the persuasiveness of a medical opinion according to the following five factors:  (1) supportability; (2) consistency; (3) the relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, and the purpose and extent of the treatment relationship; (4) specialization; and (5) other factors, including evidence showing that the medical source has familiarity with other evidence or an understanding of the SSA's policies and evidentiary requirements.  20 C.F.R. §§ 404.1520c(c), 416.920c(c).

Supportability and consistency are the most important factors, and the ALJ must explain how the ALJ considered those factors.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  "Supportability" requires an ALJ to consider that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).  "Consistency" requires an ALJ to consider that "[t]he more consistent a medical opinion[] or prior administrative medical finding[] is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] or prior administrative medical finding[] will be."  20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).  The ALJ may explain how the ALJ considered the other factors, but the ALJ is not required to do so.  20 C.F.R.

§§ 404.1520c(b)(2), 416.920c(b)(2).

Moreover, a "statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the SSA] will determine" that the claimant is "disabled." 20 C.F.R. § 404.1527(d)(1). That is because opinions about whether a claimant is disabled, the claimant's "residual functional capacity" (RFC), and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Any such statement from a treating physician may be relevant to the ALJ's findings but is not determinative, because it is the ALJ who must assess the claimant's RFC. *See, e.g.*, 20 C.F.R. § 404.1546(c).

In this case, the ALJ properly applied those new, revised regulations. As explained above, Dr. Nichols opined that, due to psychological symptoms, White would be off task 30% of an 8-hour day and would fail to report to work 10 days out of a 30-day period. Doc. 14-10 at 126. Dr. Nichols also opined that, while White's anxiety was "manageable with medication," she would be "unable to sustain concentration and persist in work-related activity at a reasonable pace," and "unable to deal with normal pressures in a competitive work setting." Doc. 14-10 at 125.

The ALJ found that Dr. Nichols' opinions that White "could not interact with others, concentrate, or handle work pressures" were "not persuasive," because the ALJ found that those opinions "[were] not consistent with the treatment notes,

[White's] own reporting on her function report, and the rest of the record." Doc. 14-3 at 42.

In considering the supportability and consistency of Dr. Nichols' opinions (*see* 20 C.F.R. §§ 404.1520c(c), 416.920c(c)), the ALJ found, for example, that White's "treatment notes indicate that [she] ha[d] largely normal mental examinations." Doc. 14-3 at 42. The ALJ found that, from March through October 2018, and from February through September 2019, White "was found to have normal attention, normal memory, normal insight, and normal judgment." Doc. 14-3 at 42.

The ALJ also found, based on function reports, that White "could concentrate to sew, watch television, paint, photograph, swim, and organize." Doc. 14-3 at 42.

The ALJ found further, based on White's own function report and the third-party function report submitted by her friend (Mary Gurley), that White "has friends and has no problems getting along with anyone." Doc. 14-3 at 42; *see* Doc. 14-7 at 32, 46.

Thus, in finding some of Dr. Nichols' opinions unpersuasive, the ALJ considered and explained that those opinions were not supported by relevant objective evidence and explanations (*see* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1)), and were not consistent with evidence from other sources (*see* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2)). Therefore, the ALJ properly applied the new, revised regulations in finding some of Dr. Nichols' opinions unpersuasive.

*See* 20 C.F.R. §§ 404.1520c(c), 416.920c(c).

Furthermore, substantial evidence supported that finding.  Dr. Nichols' opinion stated that White would have relatively extreme limitations, including stating that due to her psychological symptoms White could not maintain attention, concentration, and pace for at least 2 hours, could not interact with supervisors and/or coworkers, would be off task 30% of an 8-hour day, and would miss 10 days out of a 30-day period.  Doc. 14-10 at 126.  However, Dr. Nichols' own examination notes do not reveal the basis for the extreme nature of her opinions.  Dr. Nichols noted that White had normal thought processes, good judgment and insight, adequate mental processing, intact memory, and an adequate general knowledge fund.  Doc. 14-10 at 124.  Dr. Nichols also noted that medication had been effective for White's depression and anxiety.  Doc. 14-10 at 123, 125.

Dr. Nichols' opinions also are inconsistent with other evidence in the record. The third-party function report filed by Mary Gurley, a friend with whom White would "hang out" when "life allows," shows that White could interact with friends. Doc. 14-7 at 32.  Both Gurley's report and White's own function report showed that White was able to interact constructively with her family and talk by phone with friends.  Doc. 14-7 at 32–36, 40–47.  White's function report also showed that she enjoyed tasks requiring concentration like organizing and painting.  Doc. 14-7 at 44. Additionally, White's medical records showed on multiple occasions that her

symptoms were treated with medication, that her symptoms were "rarely experienced," that she had normal thought process, that she could hold attention normally, and that she had good judgment and insight.  Doc. 14-8 at 150–174; Doc. 14-10 at 99, 102, 105.

There is sufficient evidence that a reasonable person would find adequate to support the ALJ's finding that some of Dr. Nichols' opinions were unpersuasive because the record did not support and was not consistent with those opinions.  *See Crawford*, 363 F.3d at 1158.  Thus, substantial evidence supported the ALJ's decision.

## II.    The ALJ properly posed hypothetical questions to the vocational expert such that the ALJ's decision was based on substantial evidence.

The ALJ posed proper hypothetical questions to the VE such that the ALJ's decision was based on substantial evidence.  In her briefing, White argues that the ALJ's decision was not based on substantial evidence because the ALJ "relied on vocational expert testimony that was not based on a correct or full statement of [her] limitations and impairments."  Doc. 20 at 10; Doc. 18 at 25.  White argues that "the testimony of the VE was not substantial evidence of ability to work because the hypothetical question relied upon did not accurately state [her] mental limitations or the limitations identified by Dr. [Anand] Iyer" and "assumed [White] could perform sedentary work."  Doc. 18 at 25; Doc. 20 at 10.  White also argues that "the hypothetical question relied upon by the ALJ in denying benefits did not fully state

claimant's impairments and limitations including depression, anxiety, right knee pain and obesity." Doc. 18 at 26.

"[F]or a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Winschel*, 631 F.3d at 1180. But, if substantial evidence supports the ALJ's finding that the claimant does not have a particular limitation, the ALJ need not include that limitation in a hypothetical question to the vocational expert. *Crawford*, 363 F.3d at 1161.

In this case, the ALJ found that White had the RFC to "perform sedentary work" except that she "could occasionally push and/or pull as well as operate foot controls with the right lower extremity; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, and crouch; never kneel and crawl; and have no exposure to unprotected heights, hazardous machinery, or commercial driving"; "would be limited to understanding, remembering, and carrying out simple instructions; could have no more than occasional contact with the general public; and would need changes in the work environment to be gradually and infrequently introduced." Doc. 14-3 at 39–40.

In her briefing, White does not argue that substantial evidence did not support the ALJ's RFC determination. Instead (as discussed above), White argues that the ALJ failed to "fully state [White's] impairments and limitations" in posing

hypothetical questions to the vocational expert.  Doc. 18 at 25–26.  Because White does not challenge the ALJ's finding that White had the RFC to perform sedentary work with additional limitations, any challenge to the ALJ's RFC determination— as opposed to the questions posed to the vocational expert—is abandoned.  *See Singh*, 561 F.3d at 1278–79; *Sapuppo*, 739 F.3d at 681.

In this regard, the ALJ did not err in posing hypothetical questions to the vocational expert.  At the hearing, the ALJ posed hypothetical questions to the vocational expert—consistent with the ALJ's RFC determination—about an individual who could perform work at the sedentary exertional level with additional limitations including occasionally climbing ramps and stairs, never climbing ladders, ropes, or scaffolds, never kneeling and crawling, no exposure to unprotected heights, hazardous machinery, or commercial driving, and occasionally pushing or pulling as well as operating foot controls with the right lower extremity.  Doc. 14-3 at 74.

The ALJ's hypothetical questions to the VE also included mental limitations including restrictions to understanding, remembering, and carrying out simple instructions.  Doc. 14-3 at 74.

After receiving additional evidence, the ALJ then took the extra step of posing supplemental hypothetical questions to the vocational expert that included all of the limitations from the hypothetical questions at the hearing, along with limitations of

having no more than occasional contact with the public and needing changes in the work environment to be gradually and infrequently introduced.  Doc. 14-7 at 119.

As noted above, the hypothetical limitations that the ALJ posed to the vocational expert accurately reflect the ALJ's determination of White's RFC (*see* Doc. 14-3 at 39–40), which included consideration of White's physical and mental impairments.  The ALJ found partly persuasive the mental limitations that Dr. Nichols included in her opinion (*see* Doc. 14-10 at 122–26; *supra* Part I), and the limitations identified by Dr. Iyer, and factored them into the RFC finding.  Doc. 14-3 at 42–43.

The ALJ was not required to ask the vocational expert about any limitation that the ALJ had not found in the RFC determination—e.g., any other limitation from Dr. Nichols or Dr. Iyer, or any other impairments or limitations that White alleged, but that was not included in the ALJ's RFC determination.  *See Crawford*, 363 F.3d at 1161.  Thus, the ALJ properly relied on the VE's testimony to find that jobs existed that White could perform, and that White was not disabled.

In the end, the ALJ found that White's ability to "perform all or substantially all of the requirements" of a full range of sedentary work was "impeded by additional limitations."  Doc. 14-3 at 44.  The ALJ then found that, "[b]ased on the testimony of the vocational expert," and "considering [White's] age, education, work experience, and residual functional capacity, [she] is capable of making a successful

adjustment to other work that exists in significant numbers in the national economy." Doc. 14-3 at 45. Substantial evidence supported the ALJ's finding that White was not disabled under the Social Security Act.

### III. White has not identified any error in the ALJ's consideration of the side effects from her medications.

White has not identified any error in the ALJ's consideration of the side effects from her medications. In her briefing, White argues that the ALJ failed to properly consider her testimony that her "medications give a groggy or fatigued type feeling because she is constantly tired." Doc. 18 at 26; Doc. 20 at 11. White did testify that her medications give her "a groggy or a fatigued type feeling," and that she is "constantly tired." Doc. 14-3 at 63. But this appears to have been an isolated and unsupported assertion.

"In determining whether a claimant's impairments limit her ability to work, the ALJ considers the claimant's subjective symptoms, which includes the effectiveness and side effects of any medications taken for those symptoms." *Walker v. Commissioner of Soc. Sec.*, 404 F. App'x 362, 366 (11th Cir. 2010) (citations omitted). But this "does not relieve the claimant of the burden of proving she is disabled." *Id.* Consequently, "the claimant must introduce evidence supporting her claim that her symptoms (including any medication side effects) make her unable to work." *Id.*; *see also Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) (stating that a claimant bears the burden of furnishing medical and

other evidence in support of her claim).

Here, White has not cited any evidence showing that she complained to her doctors of side effects from her medications.  Given this lack of objective evidence, the ALJ did not err in the consideration of White's isolated testimonial suggestion about medication side effects.  *See Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990) (substantial evidence supported the ALJ's decision despite the alleged failure to consider medication side effects where the record did not reveal complaints to physicians about side effects or concerns about side effects); *see also Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 938 (11th Cir. 2011) (stating that "a claimant's failure to report side effects to his physicians is an appropriate factor for the ALJ to consider in evaluating whether a claimant's alleged symptoms are consistent with the record").

Further, neither White's ALJ hearing testimony nor her adult function reports contain any indication that the side effects from her medications could have caused a disabling effect anyway.[5]  In fact, in White's function report, she reported that she does not take her medications when she is not "able to afford them."  Doc. 14-7 at 40.  And, in response to questioning at the ALJ hearing, White testified that she does

---

[5] While the court cannot reweigh the evidence, the medical records indicate that White did not experience disabling side effects from her medications. *See, e.g.*, Doc. 14-8 at 150 ("Medications have been somewhat helpful.  Side effects have not been experienced.").

not have to sleep during the day—even if her medications sometimes make her groggy. Doc. 14-3 at 63.

The ALJ also found that, at the hearing, White had testified that she only takes medication for her mental impairments and not her physical impairments. Doc. 14-3 at 41.

To the extent that White might suggest some other error with regard to the ALJ's assessment of her medication side effects, she has not raised any additional issue for review.[6] Reviewing for substantial evidence, the court cannot guess as to what finding White hypothetically might suggest was in error, because the court cannot "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the ALJ. *Winschel*, 631 F.3d at 1178 (quotation marks and citation omitted). Thus, the ALJ did not err in the consideration of White's limited testimonial statement about medication side effects.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the court **AFFIRMS** the Commissioner's decision. The court separately will enter final

---

[6] *See, e.g.*, *Singh*, 561 F.3d at 1278–79 (11th Cir. 2009); *Sapuppo*, 739 F.3d at 681.

judgment.

      **DONE** and **ORDERED** this September 27, 2022.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE